And we will go on to the second case of the day. Let's see, as soon as everyone is situated. The second case of the day is 23-1769, Patrick Jones, Jr. v. Lake County Sheriff's Office. And good morning, Ms. Major. Yes? Good morning, Your Honors. Ruth Major, may it please the court? I am here on an appeal of a decision granting summary judgment in favor of the Lake County Sheriff's Office, the defendant. I represent a young man who had just started his career in law enforcement, working for the Lake County Sheriff's Office. Very early on in his employment, there was an issue raised at the Police Training Institute, which is an academy for police officers, as to whether he had answers to the state exam. It was investigated by the second number two in and that my client had been very honest throughout the investigation and that he should remain. Nevertheless, the Lake County Sheriff's Office, without doing any investigation, talking to my client, doing anything, terminated my client's employment and issued a memorandum accusing him of being untruthful and lacking integrity in connection with this matter. The testimony in this case was that no letter was required. They didn't even have to create this. They didn't have to say anything. If they wanted to terminate him, they could have just terminated him because he was at that point essentially an at-will employee. But they chose to write this letter. They chose to put it in his personnel file. And they testified that they knew that when he applied for other positions, that law enforcement agencies would want to know why he was terminated and that they would access, you know, want to see likely the file. And in fact, at least two police departments did. Waukegan Police Department and the Des Plaines Police Department both did see the file. If we move to the Occupational Liberty claim, where do we or how are we able to kind of satisfy the stigma plus in the sense that now that he has been rehired, is he able to satisfy that part of the claim? Well, we believe so. So, even though, first of all, he has satisfied it already because for over two years he didn't get a job and he was required to disclose this information. So, this isn't speculative where we're saying maybe he would have to disclose it. He did have to disclose it and at least... I think we'll get... Let's get to that one second. Okay. Let's first talk through now that he has an employment, is he still able to satisfy I believe so because he's got a long career ahead of him. And anytime that he's going to be trying to get promotions or go to other police departments, you know, whatever it is, whether it's federal, state, you know, local, anytime he's trying to get one of those positions, they're going to be asking him, what happened here? Why the two-year gap? Why did you leave Lake County Sheriff's Office only after a few weeks? Right. When you're talking about stigma plus, you're not just talking about an injury to someone's reputation, but you are talking about the resulting loss of some concrete right, you know, like the right to drive a car, the right to a public education. What concrete right, if any, did Mr. Jones lose apart from his right to employment? What is it? Well, Your Honor, as I understand it, the liberty interest theory under the due process involves two different aspects. One is where there's a serious impairment. That's the language the U.S. Supreme Court has used to somebody's ability to get a job. And we have that here. We have more than two years where he couldn't get a job. And the other prong is called reputational liberty. So it's occupational liberty, reputational liberty. And that's where somebody's reputation is damaged. And we have that as well here. And the constitutional violation is that he should have had due process before the occupational or reputational liberty was deprived. And that's the essence of the claim. I mean, would you agree that with respect to occupational liberty, the standard for showing interference with that liberty is and it ought to be a high one? That, I think, is what the virtually impossible language gets to. Because otherwise, wouldn't there be a risk that every discharge of a public employee will lead to such a claim? It's always going to be hard finding a new job after you've been fired. There's no question about that. Well, we're talking about over two years here and 30 jobs and every one he was denied. And this is during a time when police departments were hiring in greater numbers because a lot of people were retiring because of things that were going on in our society. So there was a push to get police officers. But U.S. versus Lovett is the United States Supreme Court decision that first recognized this whole concept of a violation of the due process based on deprivation of liberty interest. And in that case, the plaintiffs were not foreclosed from every single job. They were foreclosed from just a segment of federal jobs. Nothing about what happened prevented them from working for the state or for working in positions where they were appointed, say, by the president or these other types of jobs. It was only a very limited part of federal jobs and the United States Supreme Court found that was sufficient to establish a violation of due process based on deprivation of occupational liberty. Are we able to sidestep our finding, Townsend versus Vallis, that we satisfy U.S. versus Lovett by the three-step test? Well, I mean, I don't, Your Honor, I'm not sure. In that case, you're talking about Townsend versus Vallis? Well, I believe in that case, Your Honor, the operative term was that there had to be a tangible loss of employment opportunities. And there is here. There was two years of loss. This wasn't speculative. My client wasn't saying, I think I won't be able to get a job. For two years, over two years, he could not get a job. He was denied over 30 positions. And the only job he got, and we're proud of his job, I don't want to put this job down, but was with the sheriff's office in his own county. He could not get a job anywhere else. So, it is, we have established a tangible loss. Ms. Major, can I ask you a couple of questions off the substantive point so far that I've struggled with a little bit? Sure. One of the named defendants, is it not, is the actual Lake County Sheriff's Office. Right. So, the claim against Lake County can only be proper if the standards of Monell liability are satisfied, right? In other words, it's a claim against basically a municipal arm of government. That's correct, Your Honor. But there doesn't, and I'll have the same question for Ms. Prager. It doesn't seem that there was any effort at all in the litigation to distinguish between the defendants. In other words, there's a lot of focus on under Sheriff Oliver, but there doesn't seem to be any focus on Lake County and whether Lake County satisfies the Monell standards. Is that a fair reading of at least the record? Yeah, I don't know. The only reason I'm raising it is because even if you're right about under Sheriff Oliver, we know from the Monell line of cases that under Sheriff Oliver being responsible does not mean that the municipality is automatically responsible because there's no respondeat superior liability for the municipality. So, I've had some trouble figuring out what, how is Lake County, forget under Sheriff Oliver, how is Lake County a proper defendant for 1983 liability here? Well, Lake County made the ultimate decision to terminate his employment. That was by Lake County and to issue, I mean, ultimately the Sheriff had to approve. Pursuant to a policy or custom? No, pursuant to no policy and no custom. Okay. So, my second question then is, let's go to under Sheriff Oliver. Okay. In the litigation, I believe in the interrogatory responses. Okay. There was a response that stated, and I don't, it's sealed, but I don't think there's anything about this that's, that this is in response or in paragraph 71 that under Sheriff Oliver did not distribute the termination letter to anyone outside of the Lake County Sheriff's office. As a matter of fact, it was, it was acknowledged as a matter of fact that he didn't. So, my question is how, how can he be personally liable for anything here? Well, I don't think that, I don't think that's an accurate, I mean, I guess if you're saying him specifically, he was the number two person and he was in charge of running the office. That's what he said. Right. But that's, that was, so there in the, there was a, you know, that was sent out in the I will tell you that. So I think if he didn't play a personal role in this, how, how is he a proper 1983 defendant? Well, he, he did testify that he understood that this, that, that what he was doing, the letter he was writing would be put in the personnel file. And he understood that the personnel file would then be requested by employers who wanted to get a issues weren't right. And I'd be happy to, I guess it's better. Let me ask it a different way. Okay. What's the best evidence that you have that the letter was disseminated outside of the personnel file? So we have testimony that it was given to the merit commission when there was no reason to, and those are members of the, the Lake County community who serve on a board. And it was given to that, that committee by the Lake County Sheriff's office. Do we know the person that would have disseminated it to the merits board? It was, it was, it was on the letter that under Sheriff Oliver on his memo, he copies all these people. So he copied the merit commission as well. He also copied people that worked within the Sheriff's office who he testified had no reason to have to know this and couldn't explain why he was giving them this letter. In addition to that, one of the people that he disclosed it to who didn't need to know, none of these people needed to know any of this. And that was his testimony. None of them needed this information as to why Mr. Jones was being terminated, but he gave it to numerous people within one of them was Kaiser. No, one of them was an individual named yeah, Kaiser. And, and I think it was a Sergeant and he went around the whole Lake County Sheriff telling all kinds of people about why Mr. Jones was terminated because he got this, he got the memo, he was given the memo. So under Sheriff Oliver gave it to people outside of the Lake County Sheriff's office. And that you'll see in the bottom CC, the merit commission is not part of the Lake County Sheriff's office. Gave it to them. Gave it to people. So are you saying that the merit commission itself, as I understand it, has its own confidentiality rules with respect to personnel files? I don't know whether they adhere to them or not, but Mr. Oliver, under Sheriff Oliver is responsible for the subsequent, any subsequent disclosure the merit commission made? Well, I'm saying he gave it to, you asked me who, if he gave it to anybody outside. And I said, yes, it was to the merit commission. And he gave it to some colleagues, right? And he gave it to some people internally that he said he didn't need to give it to. And then he put it in the file knowing that other departments would ask to see the file because that's normal procedure. Well, yeah, but your client, he, he consented to the disclosure to Waukegan. He had no choice. He couldn't get a job. I mean, this is, if you look at, this is similar to, you know, this is, this falls within the Dupay. I'm not sure I'm saying it correctly. Where he, he couldn't get a job unless he agreed that they could talk, talk and disclose information. So he had no choice. This wasn't voluntary. He was obligated if he wanted to get a job to sign these releases and they knew that that would happen. The testimony in the case was that they knew that this would happen and that he would be required to provide this information and it would ruin his career. We should probably move to defamation. Yes. I know. I know. I don't know if there's any questions I can run through really fast, but there's absolute immunity. Okay. Absolute immunity with regard to the absolute immunity. The you have to, there has to be an analysis of whether there's actually, this is an action to enforce a policy that's, that's taking place. And it, and it had under federal law, the activity has to be something that's particular to the office. Okay. It can't be a generic administrative task is hiring and firing a part of sheriff Oliver's duties. But the, the, the real focus is on not on whether that's his duties, which is where things went wrong here, but on whether this is something that's special to this particular office. So this is a sheriff's like serving summonses and arresting people and those kinds of things. But, but, but, but doing things like personnel matters, every office terminates people. And in fact, like I, as I mentioned earlier, they, they testified that this wasn't even something that was required to be done. He just chose to do this for reasons nobody really has yet to understand. He didn't have to write this letter. So he doesn't have absolute immunity under federal law and under state law. He also doesn't have immunity because the immunity statute specifically carves out only negligent misrepresentations. And we've argued here that this was done. It was reckless or it was intentional. It wasn't negligent. And that should have been determined by a jury. And in addition to that this wasn't a situation where this was that, like I said, a policy, there was no policy whatsoever that he was putting into effect when he issued this letter, there was no policy at all. Okay. I have zero minutes. Thank you. Good morning judges. Beth Prager on behalf of Lake County Sheriff's Office and Sheriff, Under Sheriff Oliver, Lawrence Oliver. May it please the court. Ms. Prager, I'm going to just start you right out because in terms of absolute immunity, okay. I'm surprised that neither of the parties cited the Supreme Court's decision in Forrester versus White. Well, the, I'm sorry, did I interrupt you? No, go ahead. So plaintiff argued that the district court or by not considering federal law and that federal law applies. That is not accurate. Illinois common law governs the Illinois defamation claim. And that law has developed to very specifically and is quite different from federal law. And I'm not sure about the case you refer to, but the Illinois law is very different from the federal law. Absolute immunity applies to certain officials. I'm sorry. Forrester versus White holds that a judge's hiring and firing decisions, like those of an executive branch official are properly understood as administrative acts and as such are not entitled to absolute immunity. Certainly, I mean, I can understand that a sheriff's office needs to have honest, trustworthy deputies on which it can rely, but that is the sort of argument that the Supreme Court rejected in Forrester as a basis for absolute immunity. And as I stated, as we stated in our briefing, we argued. May I finish, please? I think that we have to put absolute immunity aside here. What we argued and what the district court found was based on Illinois law, not federal law. The Forrester was a section 1983 case, or if it was some other federal claim. But unlike in Forrester or in other cases, which involves a question, which is a section 1983, where there is no on its face defense of official immunity, state tort law in Illinois has its own set of, and this is a state law defamation claim. So absolute immunity does not apply to the Occupational Liberty claim. It applies only to the state law defamation claim. And this is the law that was applied by this court and Novoselsky and has been, should be applied because it is a state law claim. And there is a separate Illinois state common law, which does not talk about ministerial. It only is a very broad immunity. Once it's determined that the immunity, that the position is one which should be accorded immunity at it. And these, and the standard is the scope of immunity is broad. And the sole consideration is whether the statements made were reasonably related to the official duties. And in Illinois, there are cases, specific cases that hold that hiring and firing are related, reasonably related, and that under state law defamation, not under section 1983, not under other federal law claims, but under state law claims that are brought in federal court based as a pendant claim, Illinois law applies. And that is a completely different standard than the federal standard. If we look at the merits of the claim of defamation, there are some aspects of the termination letter that suggest or imply that Jones knowingly disseminated a cheat sheet. And so if those exact words aren't in the letter, is that a plausible, I guess under, if we sidestep immunity, as you suggested, is that a plausible view of the letter? The truth of what was said is, first of all, there only has to be substantial truth. Doesn't every little thing doesn't have to be perfect. If it implies false facts, then it can be actionable. But whether or not the plaintiff knew his motivation, whether he intended to cheat, whether he knew exactly what was in that document is not relevant because the sheriff was, the sheriff's office is allowed to make its own judgment based on the facts about what happened and did not have to give him the benefit of the doubt that he, oh, I said I didn't know what was in there. I didn't know it was in there. Or on the other hand, he could have said, he thought it's undisputed that it was an old test. And to him, he may have thought, it's okay to distribute an old test. It's all right. That's a legitimate study guide. To the sheriff, the sheriff could have said, that's not, was not an appropriate document for him to have. And it's not okay to distribute a, an old test unless it is approved that, like in the case of the bar exam that you have old, that old tests are on. It's not okay. That could be an issue of integrity. So the level of knowledge is not a fact that can be proved, not a verifiable fact that either can be proved or that is, would change the fact that the Miss Breger, with respect to qualified privilege, could, could a jury agree that without conducting his own investigation into the underlying facts, it, it was reckless for Mr. Oliver to say that Mr. Jones had a problem with his truthfulness and integrity, especially when you have Mr. Gallo's report here that found to the contrary. Um, well I would, first of all, I would dispute that Mr. Gallo found that there was nothing to what he did. I didn't say, wait a minute, I did not say. No, no, no. Plaintiff's counsel, plaintiff's counsel said there was nothing to it. I dispute that, that there was nothing to this. There was something to this. He received a document that he wasn't supposed to have. This is not, it was the questions and answers to the state exam. There's no doubt about that. They did not allow him to keep it. When they saw that he had it, they removed it immediately from his phone and they never gave it back to him. So this was not a document that he should have had. People reported him, the one person who reported him said, he's got the questions to, he's got the answers to the state exam. So it wasn't, there was, Joe Gallo never determined there's nothing to it. He gave him the benefit of the doubt. I think it's a good thing that the sheriff may have higher standards than the, than Mr. Gallo in terms of prospective law enforcement officers. And so he had said- What's the relationship between the sheriff's office and the merit commission? So the merit commission does the initial screening of law enforcement officers. So it's a separate, it's part of the county. It's, but it works with the sheriff and does the initial screening so that all of the officers who are eventually hired are hired based on merit and not on patronage. And so that's the original- So why was, why did under Sheriff Oliver share the report with the merit commission? The hiring had already happened. By law, the, they are required to notify the merit commission if anyone who the merit commission certified for that initial screening is disciplined or, so they're required to- By law, by what law? By the merit commission statute. Okay. By an operating standard that the merit commission has. No, it's an Illinois state law. It's in, there's a law that says the sheriff shall notify the merit commission. It's under the merit commission statute, which is part of the county code, Illinois county code. And we also attached an affidavit to our motion for summary judgment that that, that letter was not distributed anywhere. The secretary, the executive assistant for the merit commission, that's part of the record, took the letter, put it in the file. No one asked for it. No one saw it. It was never publicly referred to. So that did not cause, it was not distributed further than that. For purposes of the federal claim, it's, internal distribution doesn't constitute public dissemination. For purpose of the state claim, plaintiff has admitted that his, his, all of the disclosure was compelled disclosure. And under Illinois law, compelled disclosure is not sufficient to maintain a defamation claim. And will you go ahead and provide that for us? You said the law required him to just distribute it to the merit commission? Yes. I don't know, really it's in the, it's in the briefing, but I don't know if I have it right with me. It would be in my summary judgment motion, which I do not have here. And I, I don't know if the court in its decision, which I do have, discussed that. And as, as a, I don't know if you have any more questions about the absolute, about the, excuse me, about occupational liberty, but this- Is there any argument about Monell liability? So for the, so for- It's just, it's, it's mysterious to me why you have an arm of municipal government in here. And it, it seems very clear to me that the only way they can be liable is under Monell. And yet there's, there doesn't seem to have been a mention of Monell ever in the litigation. Well, I, I believe that under Sheriff Oliver was sued, was sued- Forget Sheriff Oliver. Forget him. The, the, the complaint named as a separate defendant, the, the office of the Lake County Sheriff. I think that was for purposes of indemnity. Well, whatever. I mean, what difference does it make what the reason was? Because the county is required to indemnify him should he be held personally responsible. Perhaps. So I, so in my opinion, no, there's, the county should, should not, is not a defendant, a Monell defendant. Was that ever argued? In the, I don't, I don't think it was ever included. And I think there was a first motion to dismiss, which dismissed the Sheriff's office under section 1983 or under which dismissed the Sheriff's office and the new complaint added the Sheriff's office as for indemnification purposes. Hold on. As we're, as we're talking right now, is the Sheriff's office in the litigation or not in the litigation? Sheriff's office is in the litigation for the Illinois state claim and for purposes of indemnification. Because there's, there's respondent superior for the Illinois claim. So they would be respondent responsible for Sheriff for under Sheriff Oliver's. If he was found liable for his, for, and I agree that under Sheriff Oliver did not have personal participation sufficient to maintain a section 1983 claim against him simply by placing the letter in the personnel file. He did not personally distribute. There's not a shred of evidence that he personally distributed. If there's not a shred of evidence that anyone read the letter or was told the contents of the letter other than what Keegan is, which is what the district court found. I'm not sure about explains where that evidence comes from as counsel argued, but as of the time of the district court decision, one, only one law enforcement office had seen that the fact that he had to tell them about his termination is just what happens when you are terminated. You're going to have to explain it. But the sheriff did not. I thought the amended complaint that you're, the amended complaint did name both defendants on the, on the U S constitutional claim under the due process clause, but the, but the amended complaint, unlike the original complaint dropped defamation, a defamation claim against the sheriff's office. And I could be wrong, but it was my understanding that they were named and plaintiff's counsel may be able to clarify this. The Lake County Sheriff's office was named for purposes of indemnification. I don't understand why you're focused on the purpose for which they're named. I don't think that has anything to do with the proper legal analysis. Well, I don't think there is any analysis holding them responsible for absolute, for occupational liberty for the section 1983. I think it's solely against under Sheriff Oliver and the allegations underneath it. That's solely against under Sheriff Oliver. There's no allegations that include in the second, in the amended complaint, there's no allegations against the sheriff's office. They're all against under Sheriff Oliver personally. And he has, but until this oral argument, nobody seems to have focused on the Lake County Sheriff's office until I started asking these questions. I can't, I can't see any indication that anyone focused on a second named defendant, a municipality, an arm of local government. Well, again, all I can say was my understanding. They were named as a party for purposes of indemnification. And that's commonly my experience with section 1983 cases. Third, they're named for purposes of indemnification. I would say every single case I've ever handled for section 1983, the entity is named for purposes of indemnification under a case, under the Moy case, which, which has, where the court held that the entity is a proper defendant for purposes of indemnification in section 1983 case. Thank you. Thank you. Yeah, Judge Roebner, I think Ms., Ms. Major here in the courtroom, you probably can't see her off camera, has a question about whether there's any rebuttal time available to her. There most certainly is. Come on up. Thank you very much, Judge Scudder. I appreciate that. Um, just to start . . . Ms. Major, you know, this is a, a kind panel. I don't . . . okay, okay. I think it is a kind panel. I will say that, yes. So, if I may, just in response to your question, Judge Scudder, you're correct. We initially had one count defamation against the Sheriff's Office and Oliver. There was a motion to dismiss, and we raised that we could amend to add the due process claim. Because the Tort Immunity Act does specifically protect the agencies from any type of tort liability in this case, we did drop the Sheriff's Office from the defamation. We did include them, though, in the federal claim. So, the federal claim is against, has two defendants. Monell was never raised, and I, I'm not prepared to go in, you know, to go into it here. I'm not trying to give anybody a hard time about Monell. I'm just, if we write an opinion that, that reverses and sends this case back. We have a case in front of us with two defendants, not just one. And the district court could quite understandably wonder, what am I supposed to do with Lake County, the Lake County Sheriff's Office? Because the only way Lake County Sheriff's Office can be held liable for a money judgment is, is if the standards of Monell are satisfied. They can't, at least for U.S. constitutional purposes, if they owe a state law indemnification obligation. It's not an obligation imposed by the Due Process Clause. And so, that's the reason I'm asking about it. Because if you win, we'd want to know, what is it that we're sending back? Okay. And I'm not, and I apologize, but I, I, I haven't really dealt with Monell for maybe 15 years now. And that's why I would have thought the state, the, the, I'm sorry, the, the Lake County  Well, the Lake County Sheriff's Office is not a proper defendant, not for purposes of a due process claim under the U.S. Constitution. Okay. And I, and this is about all I can say. That's all right. No, you don't owe me any response. I mean, I'm just telling you why I'm asking the question. And just, just to touch on a few other points, if I may, with regard to the Merit Commission, the, the evidence in this case was that the evidence, the Merit Commission only needed to be advised that there was a termination. No other information needed to be given to the Merit Commission because my client was at will. The Merit Commission doesn't have any involvement in my, you know, overseeing whether it was a proper termination or not. That only happens when he reached a certain point. So that was completely unnecessary, unnecessary. Shipping him the letter. Yes, exactly. That did not have to happen. And those are people who are active in the community that are on that commission. Um, with regard to just briefly. May I ask you this, Ms. Majors? He still would have had to, um, explain if any, um, possible employers asked him the questions, right? Absolutely. And, and, and the defendant acknowledged that. The defendant acknowledged they understand it for law enforcement officers. There, anybody who's hiring is going to want to know why did you leave after one month? And with regard to my, this, this document, it was not an exam. It wasn't an old exam. It wasn't a new exam. It was a mess of a document with all different kinds of typing on it. Some things hit answer. Some things didn't. It was, it was just like a, it was a study guide that you'd see like in law school or you'd see in any, any kind of academic setting. Um, and there was no evidence. It's undisputed. My client didn't know anything about the fact that, that some, that there had been some concerns about this document from before. Nobody knew about it. Um, the, uh, let's be the Illinois law enforcement training standards board. They did some kind of an investigation into it a couple of years earlier, but they did, they interviewed one person and then they completely dropped the whole thing and they didn't, you know, notify anybody. If you have that, don't use it. So there just was, there was nothing to that. And then just finally, um, with regard to state law, they, they, they'd have to establish under state law that there was, there's a two prong test, um, under, um, that, that they have to establish under 2.201, they have to show that, that the activity, um, of Oliver took place in the exercise, um, of, of discret, of some type of, um, um, policy or a position involving the exercise of discretion. And there was no policy here. Um, and if you look at, um, we cite to the Illinois Supreme Court's decision in, um, the Doe case, the Illinois Supreme Court has said that with regard to individuals, which is why we didn't name the office for the state claim, with regard to individuals, there is a specific provision dealing with negligent misrepresentations and under, um, under the law, um, Bose versus city of Chicago, which is a state decision where there's a general provision and a specific provision, the specific provision controls, and here the specific provision is 2-210, which the Illinois Supreme Court says does not give immunity to employees for intentional or reckless misrepresentations. So there should be a no immunity under state law, um, and there isn't under federal law as well. And if there's not, no more questions, that's all I have. Thank you. We ask that the decision be vacated. Thank you. Thank you very much. Thank you, Ms. Prager. Thank you. Ms. Major's case will be taken under advisement.